UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSEPH DOUGLAS,

                                        Plaintiff,

        -v.-                                                      9:07-CV-80
                                                                 (DNH/GJD)
D. SKELLIE, Corrections Officer, et al.,

                                        Defendants.
_____

JOSEPH DOUGLAS, Plaintiff *pro se*
KRISTA A. ROCK, Asst. Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the
Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he was subjected to excessive
force by defendants. (Complaint)(Dkt. No. 1).  Plaintiff seeks substantial monetary
relief.  Presently before the court is defendants' motion for summary judgment
pursuant to FED. R. CIV. P. 56. (Dkt. No. 27).  Plaintiff has not responded.  For the
following reasons, this court agrees that the complaint should be dismissed.

### DISCUSSION

1.  **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of
showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson*

*v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**2.    Facts**

**A.  Complaint**

Plaintiff alleges that on January 6, 2006,[1] while he was incarcerated at the Great Meadow Correctional Facility (Great Meadow), Corrections Officers Skellie and

---

[1] The complaint states that this incident took place on January 5, 2006, however, it is clear from all the evidence of record that the incident took place on January 6, 2006.  Plaintiff participated in an unrelated fight in the yard on January 5, 2006 that is discussed by defendants in their motion.

Lipka[2] came to plaintiff's cell to conduct a cell search. Compl. ¶ 6(1)(Facts).  Plaintiff states that defendant Officer Skellie told plaintiff to come out of his cell and place his hands on the bars. *Id.* ¶ 6(2).  Plaintiff claims that when he complied with this request, defendant Skellie grabbed plaintiff by the throat and began to "apply pressure." *Id.* ¶ 6(3).  Defendant Skellie then told another officer to call a sergeant. *Id.* ¶ 6(4). Shortly thereafter, defendant Corrections Sergeant Vaughn arrived on the unit, and defendant Skellie told him that plaintiff had put something in his mouth and swallowed it. *Id.* ¶ 6(5).

Plaintiff states that defendant Vaughn asked plaintiff what he had swallowed, but plaintiff maintained that he did not swallow anything. *Id.* ¶¶ 6(6)-6(7).  Plaintiff states that defendant Vaughn told defendant Corrections Officer Prevost to place plaintiff in "mechanical restraints" and escort plaintiff to the Visiting Strip Search Room, where plaintiff would be placed on the "BOSS"[3] chair.  Plaintiff states that he was escorted to the Visiting Strip Search Room by defendants Skellie, Prevost, and Vaughn. *Id.* ¶¶ 6(9).  Plaintiff alleges that on the way to the Visiting Strip Search Room, defendant Prevost threw plaintiff to the floor and "began hitting" him on the head with a baton, causing him to bleed. *Id.* ¶¶ 6(10)-6(11).

Plaintiff alleges that defendant Vaughn was "yelling" at plaintiff to get up off the floor, but plaintiff told defendant Vaughn that plaintiff could not stand up. *Id.*

---

[2] Officer Lipka is not a defendant in this case.

[3] The BOSS chair is a device for detecting metal objects that may be hidden in body cavities. Prevost Aff. ¶ 5.  The chair is equipped with a device that scans the body of an individual who sits in the chair. *Id.*

¶¶ 6(13)-6(14).  Plaintiff claims that defendant Vaughn and defendant Prevost pulled plaintiff's arms at an awkward angle in an attempt to make plaintiff stand, but when plaintiff could not do so, they began dragging plaintiff by the arms to the facility hospital. *Id.* ¶¶ 6(15)-6(17).  Plaintiff states that defendants Vaughn and Prevost placed plaintiff in an examination room at the facility hospital where he was examined by "Practitioner Nesmith" and given three stitches for the cut on his head.

### B.  Plaintiff's Deposition

Plaintiff was deposed in this case on January 28, 2008.  Excerpts of that deposition have been filed in support of defendants' motion for summary judgment. Rock Decl. Ex. B. (Dkt. No. 27-11).  Plaintiff's description of the facts was slightly different at his deposition than in his complaint.  Plaintiff's description of the beginning of the incident was the same, however, he stated that when defendant Skellie began to apply pressure to plaintiff's throat, plaintiff "grabbed for [defendant Skellie's] hands. Deposition Transcript (DT) at 13.  Plaintiff also testified that defendant Vaughn asked plaintiff what he swallowed "over and over again," and plaintiff suggested that they take him to "an x-ray" to see if he had placed anything in his mouth. (DT at 6).  Plaintiff stated that defendant Vaughn told plaintiff that he was going to be taken to the BOSS chair, that all three defendants participated in the escort, and that defendant Prevost held plaintiff from behind by plaintiff's handcuffs. *Id.*  Plaintiff testified that there was no problem with the cell frisk, and that "[n]othing took place until they escorted me . . . ." (DT at 16).

Plaintiff stated that defendant Provost held plaintiff's handcuffs as they walked,

and defendants Vaughn and Skellie walked ahead of plaintiff. (DT at 17).  Plaintiff

testified that defendant Prevost "took" plaintiff's legs and tripped him from behind,

causing plaintiff to fall to the floor. (DT at 7, 19).  Plaintiff stated that while he was on

the floor, defendant Vaughn turned around and told plaintiff to get up. (DT at 7).

When plaintiff told defendant Vaughn that he could not get up, defendant Vaughn told

plaintiff to "stop resisting." (DT at 7, 19).  Plaintiff stated that he told defendant

Vaughn that plaintiff was not resisting, but defendant Prevost then tried to pull

plaintiff by the arms, causing plaintiff to "wiggle a little bit." (DT at 7).  Plaintiff

testified that defendant Vaughn told plaintiff to "calm down," that they were trying to

make sure that everything was secure, and plaintiff complied. *Id.*

During his deposition, plaintiff alleged that defendant Skellie was holding

plaintiff's legs at an awkward angle, also trying to restrain him. *Id.*  Plaintiff states that

he began to complain that the defendants were hurting him, and defendant Prevost

punched plaintiff in the back. *Id.*  Plaintiff began to wiggle again, trying to "get out of

the hold they had [him] in." (DT at 8).  It was at that time that plaintiff alleges

defendant Prevost hit plaintiff with "a stick," causing plaintiff to suffer a cut on his

head. *Id.*  Plaintiff states that defendant Vaughn told plaintiff to stop, and he took

plaintiff to the hospital where he got the stitches. *Id.*  Later during the deposition,

plaintiff stated that defendant Prevost also told plaintiff not to resist, but that plaintiff

"panicked" and did resist because they were hurting him. (DT at 19-20).

Plaintiff also stated that at one point, defendant Prevost put his knee on

plaintiff's back, but that it was "not hard, but basically to keep [him] still." (DT at 21).

Plaintiff stated that defendant Vaughn was trying to "get them to be easy on me, 'cause there was nothing I could do", but Prevost reacted by hitting plaintiff with his baton. (DT at 21-22). Plaintiff stated that during the incident Provost was also telling plaintiff to stay still. (DT at 22).

During the deposition, plaintiff also stated that the day before the alleged assault by defendants, plaintiff had been involved in a fight with other inmates in the yard. (DT at 11). Plaintiff received a misbehavior report for the fight, to which he pled guilty and received thirty days in keeplock. (DT at 12). Although plaintiff was examined after the fight, he stated that he had no injuries. *Id.*

Each of the defendants has submitted an affidavit in support of their motion for summary judgment. The defendants describe the incident differently than the plaintiff. Defendant Prevost states that when he arrived at plaintiff's cell on January 6, 2006, defendant Vaughn told defendant Prevost and Officer Nitsche[4] to place plaintiff in handcuffs and escort him to the "visit frisk area" so that he could be scanned in the BOSS chair to determine if he had swallowed a metal object. Prevost Aff. ¶ 4. Defendant Prevost states that he and Officer Nitsche escorted plaintiff off the unit. Prevost Aff. ¶ 6.

Defendant Prevost states that as they approached the BOSS chair, plaintiff twisted quickly and intentionally fell to the floor. *Id.* ¶ 7. Defendant Prevost states that he was holding the handcuffs with his right hand, and tried to stop plaintiff from falling, but the quickness of plaintiff's movements and the pull of the restraints caused

---

[4] This officer is not named as a defendant in this case.

6

defendant Prevost to lose his balance and fall on top of plaintiff. *Id.*  Defendant

Prevost states that just before he and plaintiff hit the floor, defendant Prevost let go of

the restraints in order to brace his own fall, but he struck his right hand and his

forehead on the cement floor. *Id.* ¶ 8.  Plaintiff also hit his head on the floor as a result

of the fall, causing a one half inch laceration on plaintiff's head. *Id.* ¶ 9.  Defendant

Prevost states that plaintiff was "immediately" taken to the Infirmary at Great

Meadow, where he received the three stitches for his head. *Id.* ¶ 10.

As a result of this incident, defendant Prevost wrote a misbehavior report

against plaintiff, charging him with violent conduct. *Id.* ¶ 11 & Ex. A.  A Tier III

disciplinary hearing was held against plaintiff on January 9, 2006, after which he was

found guilty of the charge. *Id.* ¶ 13 & Ex. B.  Exhibit B is a transcript of the January 9,

2006 disciplinary hearing.  The court notes that during the disciplinary hearing,

plaintiff stated that defendant Prevost tripped plaintiff, but that "[u]pon hitting the

floor, I hit my head and I started bleeding." Prevost Aff. Ex. B at 2.  The hearing

officer asked plaintiff a second time about the incident, and plaintiff stated that he

could have Officer Vaughn "corroborate" because Officer Vaughn asked plaintiff

what happened, and plaintiff explained that "the Officer tripped me." *Id.* at 3.  There is

***absolutely no mention of defendant Prevost hitting plaintiff with his baton***.

Defendant Skellie's affidavit states that on January 6, 2006, he was ordered to

conduct a search of plaintiff's cell. Skellie Aff. ¶ 5.  Defendant Skellie states,

according to DOCS procedure, he asked plaintiff to exit his cell and place his hands

on the gallery bars. *Id.* ¶ 6.  Defendant Skellie states that, as plaintiff reached to place

his hands on the bars, defendant Skellie saw plaintiff place an unidentified object in his mouth and swallow it. *Id.* ¶ 6.  Although defendant Skellie gave plaintiff several orders to spit the object out, plaintiff did not comply, and defendant Skellie then called defendant Vaughn, who was the area supervisor. *Id.* ¶ 8.

When defendant Vaughn arrived, defendant Skellie told him that plaintiff had swallowed an object. *Id.* ¶ 9.  Defendant Skellie states that defendant Vaughn ordered plaintiff to be placed in handcuffs and escorted off the unit to the BOSS chair in the visit frisk area. *Id.*  Defendant Skellie states that plaintiff was escorted off the unit by defendant Prevost and Officer Nitsche, and that defendant Skellie had no further contact with plaintiff that day. *Id.* ¶ 11.  Instead, defendant Skellie stayed to conduct the frisk of plaintiff's cell, which resulted in the recovery of several items of contraband for which plaintiff was given another misbehavior report. *Id.* ¶¶ 12-14. Defendant Skellie wrote the misbehavior report, charging plaintiff with a variety of infractions, including violating frisk procedures and possession of contraband. Skellie Aff. ¶ 14 & Ex. B.  Exhibit B of defendant Skellie's affidavit is a copy of the misbehavior report that he wrote on January 6, 2006.  Plaintiff was found guilty of the misbehavior after a disciplinary hearing, conducted on January 12, 2006. Skellie Aff. ¶ 16.  A copy of the transcript of the January 12, 2006 disciplinary hearing has been attached to the Skellie affidavit as Exhibit C.  Defendant Skellie states that he never grabbed plaintiff by the throat and applied pressure, nor did he use force on plaintiff at any time on January 6, 2006. Skellie Aff.  ¶ 17.

Defendant Vaughn has also submitted an affidavit in support of the motion for

summary judgment. Vaughn Aff.  Defendant Vaughn states that he was summoned to

the plaintiff's housing unit on January 6, 2006 and told by defendant Skellie that he

had been directed to conduct a search of plaintiff's cell. Vaughn Aff. ¶ 6.  Defendant

Skellie told defendant Vaughn that defendant Skellie ordered plaintiff out of the cell,

and saw plaintiff place an object in his mouth as he was reaching to place his hands on

the bars. Vaughn Aff. ¶ 7.  Defendant Vaughn states that he ordered plaintiff to be

placed in handcuffs and escorted to the BOSS chair in the visit frisk area so that a scan

could be conducted. *Id.* ¶ 8.  Defendant Vaughn states that plaintiff was escorted off

the unit by defendant Prevost and Officer Nitsche. *Id.* ¶ 10.  Defendant Vaughn

accompanied the group. *Id.*  Defendant Prevost was holding the plaintiff's handcuffs

as they walked. *Id.*

Defendant Vaughn states that as they approached the BOSS chair, plaintiff

twisted quickly to his left and intentionally fell to the floor, causing defendant Prevost

to lose his balance and causing both defendant Prevost and plaintiff to fall to the floor.

*Id.*¶ 11.  Defendant Prevost hit his right hand and his forehead on the floor, and

plaintiff hit his head on the cement floor, causing a one half inch laceration on the

right side of his head. *Id.*  Defendant Vaughn also states that plaintiff was taken

immediately to the infirmary, where he received stitches. *Id.* ¶ 14.

## 3.    **Exhaustion of Administrative Remedies**

Defendants first argue that the complaint should be dismissed as against

defendants Vaughn and Skellie because plaintiff failed to exhaust his administrative

remedies regarding these two defendants.  The Prison Litigation Reform Act, (PLRA),

9

42 U.S.C. § 1997e(a) requires an inmate to exhaust all available administrative remedies prior to bringing a federal action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).

Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.  The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore*, 2005 U.S. Dist. LEXIS 6070, *12-15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004)).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12-13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 922-23 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.  In *Woodford*, the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates

10

had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS. (NYCRR), tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a)(Inmate's Responsibility).

There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8.  Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a)(Note).  The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(a) & (b).

Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau

11

of Criminal Investigations. *Id*. § 701.8(c) & (d).  The appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id*. § 701.8(h).  A similar "special" procedure is provided for claims of discrimination against an inmate. *Id*. § 701.9.

Defendants state that although plaintiff did file one grievance regarding the incident in this case, and appealed the denial of the grievance all the way to the CORC, the grievance ***only*** mentioned defendant Prevost. (Def. Mem. of Law at 5-8). Defendants argue that because plaintiff did not mention either defendant Vaughn or defendant Skellie, the complaint should be dismissed as to those defendants for failure to exhaust.

The Supreme Court in *Jones* and *Woodford* stated that an inmate must "properly" exhaust the claim, in compliance with the relevant ***state*** rules. *Jones*, 127 S. Ct. 910, 922-23; *Woodford*, 548 U.S. at 90-103.  The court in *Woodford* dismissed the complaint for failure to exhaust due to the inmate's failure to comply with the procedural rules regarding timeliness of the grievance. 548 U.S. at 93. In *Jones*, however, the Court ultimately held that exhaustion was ***not*** *per se* inadequate simply because a defendant that was later named in the civil rights complaint was not named in the grievance. *Id.* at 923.  Compliance with prison grievance procedures is all that is required by the PLRA for "proper" exhaustion. *Id.* 127 S. Ct. at 923.  The key is to examine the requirements of the State procedure.

In New York State, the grievance procedure states that a grievance must contain:

12

> [i]n addition to the grievant's name, department identification number housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, i.e., specific persons/areas contacted and responses received.

N.Y. CIV. PRAC. L. & R., tit.7, § 701.5(a)(2).  In *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004), the Second Circuit held that if the prison regulations do not prescribe a particular content for inmate grievances, the grievance will be sufficient if

> it alerts the prison to the nature of the wrong for which redress is sought.  As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming.

*Id.* (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002))(internal quotation marks omitted).

Defendants have submitted a copy of the plaintiff's grievance, together with the memoranda which constitute the investigation of the grievance. Bellamy Aff. Ex. B. While it is true that plaintiff only states that he was assaulted by defendant Prevost, the grievance is clearly complaining about the incident that forms the basis for this action.  Additionally, plaintiff does mention that defendant Skellie was present to conduct a search of plaintiff's cell.  Finally, during the investigatory phase of the grievance, the entire incident was investigated.  In one of the memoranda, Lieutenant Smith stated that, in a different complaint,[5] plaintiff alleged that "CO Skellie grabbed him by the throat . . . but does not make that claim in either facility level complaint."

---

[5] Plaintiff apparently filed various complaints regarding this incident in addition to his formal grievance.

13

*Id.* at p.5.

Even though Lieutenant Smith stated that plaintiff had not raised the claim regarding defendant Skellie's conduct in the grievance, it is clear that plaintiff's allegation that defendant Skellie grabbed plaintiff's throat was investigated.  The claim against defendant Skellie was not dismissed for failure to raise the claim in the original grievance, rather it was dismissed because plaintiff's claims were inconsistent in themselves and inconsistent with the medical evidence. *Id.*  In the grievance proceedings, an investigative memorandum written by Lieutenant Zavistaski states that plaintiff was interviewed about the incident, and actually stated that defendant Vaughn, the supervisor of the escort, did not do anything to plaintiff. *Id.* at p.8.  Sergeant Vaughn wrote his own memorandum regarding plaintiff's grievance. *Id.* at p.7.

Thus, it is clear that the entire incident was investigated, and the fact that plaintiff did not actually mention all three defendants in the formal grievance itself does not prevent the claim from being exhausted.  There are statements about all three defendants in the investigative materials supporting the denial of the grievance, and the grievance certainly "objects intelligibly to some asserted shortcoming" as required by the Second Circuit in *Johnson v. Testman*, 380 F.3d at 697.  This court will, thus, not recommend dismissal based on a failure to exhaust.  However, the court will recommend dismissing this case on the merits.

4.   **Excessive Force**

The Second Circuit has recently discussed the analysis of a claim for use of

14

excessive force. *Wright v. Goord*, 554 F.3d 255, 2009 U.S. App. LEXIS 1951, *31-35 (2d Cir. Feb. 9, 2009).  The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at *31 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham*, 490 U.S. at 394))(internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.*  The subjective component focuses on the ***motive*** for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.* at *31-32 (citing *inter alia Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 7; *Whitely v. Albers*, 475 U.S. 312, 320-21 (1986)(quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)).

The objective component focuses on the harm done, and the defendants' conduct must be "'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.'"*Whitely*, 475 U.S. at 327.  The court must

ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright*, 2009 U.S. App. LEXIS 1951 at *32-33 (quoting *Hudson*, 503 U.S. at 8)(internal quotation marks omitted).  However, where the defendants use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* (quoting *Hudson*, 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.*  The court in *Wright* emphasized that the prohibition against cruel and unusual punishment does ***not*** extend to ***de minimis*** uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson*, 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson*, 503 U.S. at 7.  The extent of the injury must be considered "in context." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).  The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely*, 475 U.S. at 321.

In this case, the court must note that plaintiff has given ***inconsistent versions*** of the incident in question at all levels.  The court will consider the various claims that

plaintiff has made as against all the defendants, none of which amount to Eighth
Amendment claims.

**A.    Defendant Skellie**

Plaintiff makes two claims in his complaint about defendant Skellie.  First,
plaintiff alleges that while plaintiff was placing his hands on the company bars in
preparation for the cell frisk, defendant Skellie grabbed plaintiff by the throat and
"began" to apply pressure.  Defendant Skellie denies grabbing plaintiff by the throat
or using any kind of force against plaintiff. Skellie Aff. ¶ 17.  Even assuming that
defendant Skellie grabbed plaintiff by the throat, plaintiff concedes that the reason for
this action was that defendant Skellie thought he saw plaintiff swallow something.

There was no injury claimed as a result of Skellie's alleged action, and although
plaintiff apparently complained about his throat being "grabbed," in *some* facility
complaint as stated in Lieutenant Smith's memorandum[6], plaintiff never mentioned
this conduct specifically in his grievance and never mentioned it during the
disciplinary hearing that was later held against him for "violent conduct." Prevost Aff.
Ex. B (Transcript of Jan. 9, 2006 Disciplinary Hearing).  Additionally, plaintiff states
that defendant Skellie "began" to apply pressure.  There is no claim that defendant

---

[6] Lieutenant Smith states in his memorandum that he "reviewed Douglas's disciplinary
file" and noticed that an investigation into this incident was conducted "on a facility complaint, a
complaint sent to Assistant Commissioner Bee, and a personal complaint to medical staff on this
same issue." Bellamy Aff. Ex. B at p.5.  Lieutenant Smith states that a review of those
complaints shows several inconsistencies, including that plaintiff claimed that CO Skellie
grabbed him by the throat, a claim that he did not make in either "facility level complaint." *Id.*
Lieutenant Smith also noted that a medical determination contradicted plaintiff's claim that his
head injury was caused by a "baton." *Id.*

Skellie actually continued to apply pressure or choked plaintiff in any way.  Even during plaintiff's deposition, plaintiff only stated that defendant Skellie "began" to apply pressure, but then called Sergeant Vaughn to the area. (DT at 5).  Plaintiff ***never*** again mentions that part of the incident.  Thus, the force was *de minimis* and if applied at all, was applied because defendant Skellie believed that plaintiff had swallowed something.  Thus, there is no claim for excessive force with respect to the incident outside of plaintiff's cell.

Plaintiff also claims in his complaint that defendant Skellie was one of the escort officers. Compl. ¶ 9.  Although plaintiff makes ***no further statements about defendant Skellie in the complaint***, during his deposition, plaintiff claimed that defendant Skellie was one of the escort officers, and that defendant Skellie somehow was holding plaintiff's legs trying to restrain plaintiff during the alleged assault by defendant Prevost. (DT at p.6).  Plaintiff is correct that there were three officers escorting him to the BOSS chair, however, defendant Skellie was ***not*** one of them.  At his deposition, plaintiff testified that the three officers were defendants Vaughn, Prevost, and Skellie. (DT at p.6).   However, the records show that Officer Nitsche was the third officer, escorting plaintiff to the BOSS chair. Prevost Aff. ¶ 4; Prevost Aff. Ex. A (Inmate Misbehavior Report, dated Jan. 6, 2006), showing that the employee witness to the incident was "J. Nitsche"; Bellamy Aff. Ex. B at p.12 (Memorandum from C.O. J. Nitsche to Sgt. Vaughn, stating that C.O. Nitsche was "accompanying C.O Prevost in an escort of Inmate Douglas to the BOSS chair."

At plaintiff's deposition, he stated that defendant Skellie was walking ahead

18

with defendant Vaughn, and defendant Prevost was walking with plaintiff, holding the handcuffs. (DT at 17).  During the deposition, plaintiff claimed for the ***first*** time that defendant Skellie came over to plaintiff and held his feet after plaintiff fell, and defendant Skellie was "bending [plaintiff's] legs." (DT at 21).  Defendant Skellie states that he was ***not*** one of the individuals escorting plaintiff, and supports this claim by stating that he was assigned to search plaintiff's cell, and as the other officers took plaintiff to the BOSS chair, defendant Skellie and Officer Lipke stayed behind to complete their original assignment to search plaintiff's cell for contraband. Skellie Aff. ¶¶ 11-12.

Defendant Skellie states that he found various unauthorized items in plaintiff's cell as a result of the search. Skellie Aff. ¶ 12.  Defendant Skellie wrote a misbehavior report, charging plaintiff with various rule violations, including the possession of contraband. Skellie Aff. Ex. B.  The misbehavior report, written on the same day as the incident, states that the plaintiff "was escorted off the unit by CO's Prevost & Nitche [sic]." *Id.*  The misbehavior report then states "***[a]t this time***, we completed the cell frisk of A-5-9 Douglas." *Id.* (emphasis added).  Defendant Skellie states in his affidavit that after plaintiff was escorted off the unit, defendant Skellie had no further contact with plaintiff that day. Skellie Aff. ¶ 11.

The records ***fully support*** defendant Skellie's statement that he was not present at the time that plaintiff alleges he was hit by defendant Prevost.  Plaintiff has not responded to the summary judgment motion, and his inconsistent statements throughout regarding defendant Skellie's involvement in the second incident do not

raise a genuine issue of material fact with respect to an Eighth Amendment claim against defendant Skellie.  Thus, the complaint may be dismissed as against this defendant.

### B.  Defendants Vaughn and Prevost

Defendants Vaughn and Prevost were not present for the initial incident in which defendant Skellie allegedly grabbed plaintiff's throat.  By plaintiff's own allegations and statements at his deposition, defendants Vaughn and Prevost arrived in response to defendant Skellie's call. (DT at 13-14).  Defendant Vaughn was the supervising officer in escorting plaintiff to the BOSS chair, and plaintiff testified at his deposition that defendant Vaughn walked ahead of plaintiff and defendant Prevost. (DT at 17).  In his complaint, plaintiff alleges that at some point during the escort, defendant Prevost "threw" plaintiff to the floor. Compl. ¶ 10.  At plaintiff's deposition, he testified that defendant Prevost "tripped" plaintiff, causing him to fall. (DT at 18-19).

Plaintiff claims in the complaint that after plaintiff fell, defendant Prevost hit plaintiff on the head with a baton. Compl. ¶ 11.  However, during the investigation of plaintiff's grievance, he told Lieutenant Zavistaski that the head injury resulted from plaintiff's head hitting the floor. Bellamy Aff. Ex. B at 8.  During the interview with Lieutenant Zavistaski, plaintiff also stated that defendant Vaughn did not do anything to plaintiff, and plaintiff specifically stated that the staff did not use a baton on him. *Id.*  On January 10, 2006, plaintiff told a nurse in the medical department that he was having headaches, caused by an assault by staff, using a baton. *Id.*  However, when

20

Sergeant Eisenschmidt interviewed plaintiff on January 10, 2006, plaintiff stated that the injury was caused by the fall and never mentioned being hit by a baton. *Id.* Finally, Lieutenant Zavistaski's memorandum states that Physician's Assistant Nesmith concluded that plaintiff's one half inch laceration was ***not*** consistent with being hit by a baton. *Id.*

The memorandum written by Lieutenant K.H. Smith to Superintendent Greene also discusses the inconsistencies in plaintiff's allegations to various people. Lieutenant Smith's memorandum also states that to some individuals, plaintiff alleged that defendant Prevost hit him with a baton, while to others, including Lieutenant Smith, plaintiff stated that defendant Prevost only threw plaintiff to the floor. Bellamy Aff. Ex. B at 4.

Defendant Prevost states that plaintiff twisted his body and fell intentionally, causing Prevost to lose his balance and fall on top of plaintiff. Prevost Aff. ¶ 7. Defendant Prevost states that because he was holding plaintiff's restraints until just before he and plaintiff hit the floor, Prevost hit his own head and his right hand on the floor. *Id.*  Plaintiff testified at his deposition that when he and Prevost fell to the ground, defendant Vaughn turned around and told plaintiff "not to resist." (DT at 19-20, 22).  Plaintiff also states that defendant Vaughn "was reacting the way I thought he would react as far as . . . getting them to be easy on me, 'cause there was nothing I could do." (DT at 21).

Although plaintiff accuses defendant Vaughn of "yelling" at him, plaintiff's own deposition testimony states that defendant Vaughn was telling plaintiff not to

resist and trying to get defendant Prevost to be "easy" on plaintiff. (DT at 21). Plaintiff testified that his shoulder was hurting, and he was "wiggling." (DT at 21-22). Plaintiff stated that Prevost "reacted" by hitting plaintiff. (DT at 22). Plaintiff stated that Prevost hit plaintiff when plaintiff "just kept wiggling," after defendant Vaughn told plaintiff not to "resist." (DT 22-23).

Plaintiff also testified that after the "incident" was over, the defendants "picked [him] up and took [him] to the hospital." (DT at 23-24). In plaintiff's complaint, he alleges that the defendants "dragged" plaintiff to the hospital by his arms. During his deposition, plaintiff never mentioned that he was "dragged" anywhere. Again, plaintiff's statements regarding the incident are inconsistent.

There is absolutely no evidence to show that defendant Vaughn used any physical force on plaintiff or was involved in the alleged "assault." Plaintiff testified that Vaughn had his back to plaintiff until after plaintiff and Prevost fell to the floor, and plaintiff states he "screamed" and was "wiggling." There is no allegation that defendant Vaughn would have known who caused the fall or what plaintiff was doing on the floor. This is supported by plaintiff's own testimony stating that Vaughn was telling plaintiff not to "resist," and that Vaughn was trying to get defendant Prevost to "take it easy" on plaintiff.[7]

---

[7] This is not a case in which plaintiff is claiming that defendant Vaughn violated the Eighth Amendment due to his failure to intervene. *See Atkins v. County of Orange*, 372 F. Supp. 2d 377, 407 (S.D.N.Y. 2005)(law enforcement officer's affirmative duty to intervene exists only where a person's constitutional rights have been violated). It is not even clear from the plaintiff's own complaint that defendant Vaughn had any idea when he turned around that plaintiff had not initiated the incident.

To the extent that plaintiff alleges in his complaint that defendant Vaughn "started yelling at the plaintiff . . . to get up off the floor," it is well-settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).  There is absolutely no way that a reasonable juror could find that defendant Vaughn acted maliciously or sadistically during the incident described by plaintiff.

Plaintiff alleges that defendant Prevost hit plaintiff on the head with his baton, causing plaintiff's injury.  As stated above, plaintiff's injury was a one half inch laceration that required three stitches.  Thus, the injury, in itself was not significant, however as stated above, the inquiry does not end at the extent of the injury.  The court must look further and analyze the situation as well as the need for the force.  In this case, defendant Prevost denies ever hitting plaintiff and alleges that plaintiff caused the fall by twisting sharply to the left as he and Prevost were walking toward the area where the BOSS chair was located.

Plaintiff has made many inconsistent statements during both the administrative investigation and this action.  Plaintiff was interviewed regarding his grievance and did not mention the baton.  Particularly significant is the plaintiff's testimony at the disciplinary hearing held against him as a result of the incident. Prevost Aff. Ex. B. The hearing officer asked plaintiff to state his "side" of the story and tell the hearing officer what happened that day.  Plaintiff described the incident to the hearing officer:

> . . . On their way to escort me from the company to go to

23

> their Visiting Frisk area Officer Prevost had my cuffs from
> behind with one hand.  He tripped me and threw me on the
> floor.  ***Upon hitting the floor I hit my head and I started
> bleeding***.  I needed stitches in my head.  So I never made it
> to the boards chair to the strip frisk room.  They took me to
> the hospital and I got stitches and they brought me back to
> my cell.

*Id.* at p.2 (emphasis aded).  Later during his disciplinary hearing testimony, during the

time plaintiff was denying that he made a "twisting" motion causing the fall, plaintiff

stated:

> Yes and I could have Sgt. Vaughn corroborate that as well.
> He was also there when I fell and he asked me what
> happened.  I told him the Officer tripped me . . . . I explained
> to him that he tripped me.  So then by that point he took me
> to medical.

*Id.* at p.3.  The disciplinary hearing took place three days after the incident, and the

hearing officer gave plaintiff every opportunity to describe the incident.  There was no

mention of a baton, and there is no indication that the conduct could be viewed as

malicious or sadistic.  It is odd that plaintiff would not have remembered such a

critical part of the incident.[8]  Thus, plaintiff has failed to substantiate his Eighth

Amendment claim for purposes of summary judgment, and the complaint may be

---

[8] The court notes that during the deposition, plaintiff embellished the incident further, claiming that at one point, defendant Prevost had his knee in plaintiff's back, a claim that never appeared anywhere until the plaintiff's deposition. (DT at 21).  Even that testimony was equivocal.  Plaintiff stated that while defendant Prevost was getting up he "put his knee on [plaintiff's] back . . . not hard, but basically to keep me still." (DT at 21).  Plaintiff also claimed for the ***first and only time***, that defendant Prevost "punched" plaintiff in the back. (DT at 7).

dismissed in its entirety.[9]

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED and the complaint DISMISSED IN ITS ENTIRETY.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 11, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

[9] Defendants also allege that the complaint must be dismissed against them in their "official capacities." Although the court need not reach this argument since the court has found no constitutional violation, it is noted that the Eleventh Amendment would prevent defendants from being sued for damages in their "official capacities." *See Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995)(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989))(no section 1983 claim for damages against the state itself); *Yorktown Medical Laboratory v. Perales*, 984 F.2d 84, 87 (2d Cir. 1991)(an action against an officer in his or her official capacity is tantamount to suing the state).